UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH

JOSHUA T. FOX                                                                        PLAINTIFF

v.                                  CIVIL ACTION NO. 5:14CV-P231-TBR

ADAM WOFFORD *et al.*                                           DEFENDANTS

### MEMORANDUM OPINION AND ORDER

Plaintiff Joshua T. Fox, a prisoner currently incarcerated in the Crittenden County Detention Center, filed a *pro se* complaint under 42 U.S.C. § 1983. This matter is before the Court for initial review of the complaint pursuant to 28 U.S.C. § 1915A and *McGore v. Wrigglesworth*, 114 F.3d 60 (6th Cir. 1997), *overruled on other grounds by Jones v. Bock*, 549 U.S. 199 (2007).

For the reasons that follow, the Court will allow the following claims to proceed: (1) the Fourteenth Amendment due process claim against Defendants Wofford, Whitfield, and Lowe in their individual capacities; (2) the Fourth Amendment search and seizure claim against Defendants Wofford and Hampton in their individual capacities; and (3) the Fourth Amendment excessive-force claim against Defendants Wofford and Hampton in their individual capacities. All other claims will be dismissed from this action.

### I. SUMMARY OF CLAIMS

Plaintiff identifies the following four Defendants in this action: (1) Adam Wofford, a Probation & Parole Officer in the Paducah Probation and Parole Office; (2) Joshua Whitfield, also a Probation & Parole Officer in the Paducah Probation and Parole Office; (3) Jimmy Lowe, Program Director, Department of Corrections; and (4) Logan Hampton, a police officer with the

Mayfield Police Department.  Each Defendant is sued in his individual and official capacities. Plaintiff seeks monetary damages.

Plaintiff states that on July 7, 2014, in anticipation of Plaintiff being released to the Home Incarceration Program (HIP), Defendant Wofford called Plaintiff's mother, Rebecca Fox, "for the approval of [his] home placement."  According to Plaintiff, Defendant Wofford never physically went to Fox's home as is required by the HIP handbook, and he never told his supervisor, Defendant Lowe, that he did not actually go.  Plaintiff states that if Defendant had visited the home, he would have known "if there was any guns, drugs or alcohol in the house." According to Plaintiff, after speaking with Fox, Defendant Wofford "called the Graves County RC Center and told Eric Hampton to release Plaintiff two days later, July 9th."  Plaintiff states that he was released from the Graves County RC Center on July 9, 2014.

After his release, Plaintiff represents, he called the Leimac Home Incarceration contact number and followed the instructions.  "According to the schedule provided on July 10, 2014, [Plaintiff] was advised to report to [Defendant Wofford] in Paducah Kentucky to have [his] traditional RF Monitoring Unit hooked up; however, when [he] arrived [he] was greeted" by Defendant Whitfield.  At this meeting, Plaintiff states that his monitor was placed on his ankle, he was given an electronic box, he was told to plug the electronic box in when he got home, and he was given a schedule and a series of papers explaining home incarceration.  The schedule, Plaintiff represents, allowed him to be outside his mother's residence between the hours of 9 a.m. and 2 p.m.

When Plaintiff arrived home, he states that he plugged the electronic box into the wall and called Leimac Home Incarceration to attempt to set up the box.  Plaintiff states that despite following the instructions of the representative on the phone, they were unable to properly set up

the device. According to Plaintiff, the Leimac representative told Plaintiff that the problem would be "logged and they [would] notify [Plaintiff's] Parole and Probation Officer about the problem."

Plaintiff states that the following morning he went "to the Social Security Office at 9:30 am" and then went to eat breakfast at a local diner. When Plaintiff arrived back at his mother's house at 12:30 p.m., he states that his mother informed him that "the HIP representative had called and said [Plaintiff] was out of range and that [he] was in violation of the Home Incarceration Program." According to Plaintiff, he immediately called Leimac and informed them that his schedule allowed him to be out of his mother's house between the hours of nine and two. Plaintiff states that the Leimac representative told him that "they did not have a schedule on file."

Plaintiff states that on July 11, 2014, he received many calls throughout the night from the HIP monitoring company informing him that he was out of range. Plaintiff states that they "told them that they were calling [him] on the house phone so [he] was obviously home and they could come by and check at any time." According to Plaintiff, the following morning he opened the door at his mother's house in response to knocking and found Defendants Wofford and Hampton. "They proceeded in the house, without a proper greeting." Defendants had Plaintiff sit down and, "in a very aggressive tone," they asked where Plaintiff slept. Plaintiff states that he pointed in the direction of his room. Thereafter, Plaintiff represents, Defendant Wofford instructed Defendant Hampton to search Plaintiff's bedroom. According to Plaintiff, Defendant Hampton went and searched Plaintiff's room.

Plaintiff states that Defendant Wofford asked where the basement was located. After Plaintiff told him, Plaintiff states that Defendant Wofford headed toward the basement where he

started asking questions of a family friend who was in the basement. Plaintiff states that Defendant Wofford "grabbed a decorative sword from its mantle on display that was sitting on top of the big screen television." Defendant Wofford, according to Plaintiff, informed Plaintiff's mother that Plaintiff was not allowed to be around the sword. Plaintiff states that he then asked Defendant Wofford, "well why didn't you come search the home before approving my home placement. [Plaintiff] told him that sword was for decorations and was never a problem with any other programs [Plaintiff had] been in involving the Probation and Parole office." According to Plaintiff, he informed Defendant Wofford about the deficiencies in Defendant Wofford's placement of Plaintiff on home incarceration, but Defendant Wofford ignored Plaintiff's arguments about how he was not doing his job correctly. Plaintiff states that Defendant Wofford stepped out of the house for a moment, and when he returned, he instructed Defendant Hampton to arrest Plaintiff. Plaintiff states that he put up his hands, but questioned Defendant Wofford about why he was arresting him when he did not do anything wrong. Defendant Hampton, according to Plaintiff, pulled out his Taser and aimed it at Plaintiff's face. Plaintiff states that he "panicked, picked up a table and used it as a shield from getting hit in [his] face." Defendant Hampton instructed Plaintiff to put down the table; Plaintiff states that he agreed if Hampton would lower his Taser. Plaintiff states that he lowered the table, but Defendant Hampton deployed the Taser, hitting Plaintiff in the chest. Plaintiff states that he "felt a painful burning sensation, [he] panicked, pulled the wires out of [his] chest and the next thing [he] knew, [he] was being hit in the head and shoulders with a black stick object by [Defendant] Hampton." Plaintiff states that Defendant Wofford began to kick him, and he fought back. He states that he "was scared for [his] life" and "didn't want to be another black man murdered by the police." Plaintiff states the he "fought for [his] life." According to Plaintiff, Defendant Hampton again

4

deployed his Taser.  According to Plaintiff, the Taser was in both their hands and "was hitting us both as the wrestling continued."  Plaintiff continues,

> [d]uring the scuffle, the taser fell on the floor I knew I had to act quickly and this would be my only chance to get away safely so I ran for my life.  On my way out the back door, I kicked the taser outside, ran down the steps and screamed for help.  No one was around so I ran to the nearest and safest location I could find.

Plaintiff contends that Defendant Wofford violated his Fourteenth Amendment right to due process when he failed to perform a proper assessment of his home placement and failed to hook up his home monitoring equipment as required by Department of Corrections (DOC) Policy 25.12.  Plaintiff contends that this lack of a proper home assessment and lack of proper installation of the home monitoring equipment later put Plaintiff in violation of his home incarceration rules and resulted in Plaintiff being returned to prison.  Plaintiff contends that Defendants Wofford and Hampton violated the Fourth Amendment when they searched his home without a warrant, and arrested him and returned him to prison.  As to Defendants Wofford and Hampton, Plaintiff also contends that "[t]he aggressive, negligent actions performed by both [Defendants Hampton and Wofford] violated [his] civil rights.

Plaintiff contends that Defendant Lowe violated the Fourteenth Amendment because he approved the home incarceration even though the proper procedures had not been followed.

Plaintiff also contends that Defendant Whitfield violated his Fourteenth Amendment right to due process when he allowed Plaintiff to "take the RF unit home and hook up which put [Plaintiff] in violation because [Plaintiff] hooked the unit up wrong which caused [him] to return to prison to serve the remained of [his] sentence."  Further,

5

Plaintiff contends that Defendant Whitfield's failure to place his schedule in his file also violated his Fourteenth Amendment rights.

## II. STANDARD OF REVIEW

When a prisoner initiates a civil action seeking redress from a governmental entity, officer, or employee, the trial court must review the complaint and dismiss the complaint, or any portion of it, if it determines that the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A; *McGore v. Wrigglesworth*, 114 F.3d at 604. A claim is legally frivolous when it lacks an arguable basis either in law or in fact. *Neitzke v. Williams*, 90 U.S. 319, 325 (1989). The trial court may, therefore, dismiss a claim as frivolous where it is based on an indisputably meritless legal theory or where the factual contentions are clearly baseless. *Id.* at 327. In order to survive dismissal for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"[A] district court must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true." *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citing *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (citations omitted)). "But the district court need not accept a 'bare assertion of legal conclusions.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d at 488 (quoting *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995)). The court's duty "does not require [it] to conjure up unpled allegations," *McDonald v. Hall*, 610 F.2d 16, 19 (1st Cir. 1979), or to create a claim for a plaintiff. *Clark v. Nat'l Travelers Life Ins. Co.*, 518 F.2d 1167, 1169

(6th Cir. 1975). To command otherwise would require the Court "to explore exhaustively all potential claims of a *pro se* plaintiff, [and] would also transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

### III. ANALYSIS

#### A. Official-Capacity Claims

##### 1. Eleventh Amendment Immunity

Under the Eleventh Amendment to the U.S. Constitution,[1] a state and its agencies may not be sued in federal court, regardless of the relief sought, unless the state has waived its immunity or Congress has overridden it. *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 124 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978). The Commonwealth of Kentucky has not waived its immunity, *see Adams v. Morris*, 90 F. App'x 856, 857 (6th Cir. 2004), and in enacting § 1983, Congress did not intend to override the traditional sovereign immunity of the states. *Whittington v. Milby*, 928 F.2d 188, 193-94 (6th Cir. 1991) (citing *Quern v. Jordan*, 440 U.S. 332, 341 (1979)); *see Ferritto v. Ohio Dep't of Highway Safety*, No. 90-3475, 1991 WL 37824, at *2 (6th Cir. Mar. 19, 1991) ("The Eleventh Amendment prohibits actions against states and state agencies under section 1983 and section 1985."). The Eleventh Amendment similarly bars the damages claims against state officials sued in their official capacity. *See Kentucky v.*

---

[1]"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "While the Amendment by its terms does not bar suits against a State by its own citizens, [the Supreme Court] has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974).

*Graham*, 473 U.S. 159, 169 (1985) ("This [Eleventh Amendment] bar remains in effect when State officials are sued for damages in their official capacity."); *McCrary v. Ohio Dep't of Human Servs.*, No. 99-3597, 2000 WL 1140750, at *3 (6th Cir. Aug. 8, 2000) (finding § 1983 and § 1985 claims against a state agency and its employees in their official capacities for damages barred by Eleventh Amendment immunity).

Plaintiff sues Defendants Wofford, Whitfield, and Lowe in their official capacities as employees of the Kentucky Department of Corrections. All of these claims are barred by Eleventh Amendment immunity.

Accordingly, the official-capacity claims against Defendants Wofford, Whitfield, and Lowe will be dismissed from this action pursuant to 28 U.S.C. § 1915A(b)(2).

### 2. *Municipal Liability*

Plaintiff sues Defendant Hampton in his official capacity as an employee of the City of Mayfield, Kentucky. "Official-capacity suits . . . 'generally represent [] another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 690 n.55 (1978)). Suing Defendant Hampton in his official capacity is the equivalent of suing his employer, the City of Mayfield. *See Lambert v. Hartman*, 517 F.3d 433, 439-40 (6th Cir. 2008) (stating that civil rights suit against county clerk of courts in his official capacity was equivalent of suing clerk's employer, the county); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) (advising that since the county police department is not an entity which may be sued, the county is the proper party); *Bradford v. Hammond*, No. Civ.A.3:05CVP459-H, 2005 WL 2739154, at *2 (W.D. Ky. Oct. 21, 2005) (construing a claim against Louisville Metro Corrections as one brought against Louisville/Jefferson County Metro Government); *Smallwood v. Jefferson Cnty.*

*Gov't*, 743 F. Supp. 502, 503 (W.D. Ky. 1990) (concluding that a suit against the Jefferson County Government, the Jefferson County Fiscal Court, and the Jefferson County Judge Executive is actually a suit against Jefferson County itself).

When a § 1983 claim is made against a municipality, this Court must analyze two distinct issues: (1) whether Plaintiff's harm was caused by a constitutional violation; and (2) if so, whether the municipality is responsible for that violation. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992). The Court will first address the second issue, *i.e.*, whether the municipality is responsible for the alleged constitutional violation.

"[A] municipality cannot be held liable *solely* because it employs a tortfeasor -- or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. at 691; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994); *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir. 1994). "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986).

A municipality cannot be held responsible for a constitutional deprivation unless there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation. *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. at 694; *Deaton v. Montgomery Cnty., Ohio*, 989 F.2d 885, 889 (6th Cir. 1993). Simply stated, "a plaintiff must 'identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy.'" *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987),

*overruled on other grounds by Frantz v. Vill. of Bradford*, 245 F.3d 869 (6th Cir. 2001)). The policy or custom "must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." *Searcy v. City of Dayton*, 38 F.3d at 286 (quoting *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981) (citation omitted)).

In the instant case, Plaintiff has not alleged that a municipal policy or custom caused his alleged harm. As nothing in the complaint demonstrates any purported wrongdoing occurred as a result of a policy or custom implemented or endorsed by the City of Mayfield, the complaint fails to establish a basis of liability against this municipality, and it fails to state a cognizable § 1983 claim.

Accordingly, the official-capacity claim against Defendant Hampton will be dismissed pursuant to 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

## B. *Individual-Capacity Claims*

### 1. *Fourteenth Amendment Due Process Claim*

Plaintiff contends that Defendants Wofford, Whitfield, and Lowe violated his Fourteenth Amendment right to due process. As to Defendant Wofford, Plaintiff alleges he violated his Fourteenth Amendment right to due process when he failed to perform a proper assessment of his home placement and failed to hook up his home monitoring equipment as required by Department of Corrections (DOC) Policy 25.12. Plaintiff contends that Defendant Whitfield violated his Fourteenth Amendment right to due process when he allowed Plaintiff to take the RF unit home and hook it up himself and when he failed to place Plaintiff's schedule in his file. Plaintiff contends that Defendant Lowe violated the Fourteenth Amendment because he

approved the home incarceration even though the proper procedures had not been followed by Defendant Wofford.

The Court will allow the Fourteenth Amendment due process claim to proceed against Defendants Wofford, Whitfield, and Lowe in their individual capacities.

### 2. *Search and Seizure Claim*

Plaintiff contends that Defendants Wofford and Hampton violated the Fourth Amendment when they searched his home without a warrant, and arrested him and returned him to prison.

The Court will allow the Fourth Amendment search and seizure claim to proceed against Defendants Wofford and Hampton in their individual capacities.

### 3. *Excessive-Force Claim*

As to Defendants Wofford and Hampton, Plaintiff states that "[t]he aggressive, negligent actions performed by both [Defendants Wofford and Hampton] violated [his] civil rights." A claim of excessive force in the course of making an arrest, investigatory stop or other seizure of one's person invokes the protection of the Fourth Amendment, which guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures" of the person. *Graham v. Connor*, 490 U.S. 386, 395 (1989) (quoting U.S. Const. amend. IV); *see also Marvin v. City of Taylor*, 509 F.3d 234, 244 (6th Cir. 2007) (stating that a claim of "excessive force in the course of making an arrest . . . [is] properly analyzed under the Fourth Amendment's 'objective reasonableness' standard") (citation omitted). Since Plaintiff alleges excessive force in the course of an arrest, the Fourth Amendment applies to this action.

The Court will allow the Fourth Amendment excessive-force claim to proceed against Defendants Wofford and Hampton in their individual capacities.

## IV.  ORDER

For the reasons set forth more fully above, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** as follows:  (1) the official-capacity claims against Defendants Wofford, Whitfield, and Lowe are **DISMISSED** from this action pursuant to 28 U.S.C. § 1915A(b)(2) since they seek monetary relief from a Defendant who is immune from such relief; and (2) the official-capacity claim against Defendant Hampton is **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

The Court will enter a separate Scheduling Order directing service and governing the development of the continuing claims.  In permitting these claims to continue, the Court passes no judgment on the merits and ultimate outcome of the action.

Date:

cc:     Plaintiff, *pro se*
        Defendants
4413.003